# In the United States Court of Federal Claims

BID PROTEST

No. 17-204C

(Filed Under Seal: April 27, 2017 | Reissued: May 9, 2017)[*]

|  |  |
|---|---|
| IT ENTERPRISE SOLUTIONS JV, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant,<br>and<br><br>VALDEZ INTERNATIONAL CORPORATION,<br><br>Defendant-Intervenor. | Keywords: Bid Protest; Tucker Act; 28 U.S.C. § 1491(b)(1); Judgment on the Administrative Record; RCFC 52.1; Best Value Determination; Past Performance. |

*Michelle E. Litteken*, PilieroMazza PLLC, Washington, DC, for Plaintiff. *Antonio R. Franco*, *Kathryn V. Flood*, and *Marc B. Langston*, PilieroMazza PLLC, Washington, DC, Of Counsel.

*Steven C. Hough*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Brian A. Mizoguchi*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General.

*Robert S. Gardner*, Law Office of Robert S. Gardner, Colorado Springs, CO, for Defendant-Intervenor. *Angeline R. Burke* and *Laura A. Gardner*, Law Office of Robert S. Gardner, Colorado Springs, CO, Of Counsel.

---

[*]This Opinion was originally issued under seal on April 27, 2017, and the parties were given the opportunity to request redactions. No party has requested any redactions and this Opinion is now reissued publicly in its original form.

## OPINION AND ORDER

**KAPLAN, Judge.**

This post-award bid protest involves the award of a contract to provide services in support of the Air Force's cyberspace operations. Plaintiff IT Enterprise Solutions JV, LLC (ITES) challenges the Air Force's decision to award the contract to Defendant-Intervenor Valdez International Corporation (Valdez), arguing that the agency's assessment of ITES's past performance as well as its best value analysis conflicted with the terms of the solicitation. The government and Valdez, meanwhile, have moved to dismiss ITES's claims for lack of jurisdiction, arguing that it lacks standing to pursue them. They have also filed cross-motions for judgment on the administrative record.

For the reasons discussed below, the Court concludes that ITES has standing to pursue its claims because—absent the errors it alleges—it would have had a substantial chance of winning the contract award. Therefore, the motions to dismiss are **DENIED**. The award to Valdez, however, was neither arbitrary, nor capricious, nor contrary to law. Accordingly, ITES's motion for judgment on the administrative record is **DENIED**, and the government's and Valdez's cross-motions are **GRANTED**.

## BACKGROUND

### I.    The Solicitation

On March 13, 2015, the Air Force issued solicitation number FA8773-15-R-8007, entitled "Integrated Air Force Network Operations and Services (IAFNOS)" (RFP or "the Solicitation"). Admin. R. (AR) Tab 7 at 137. The Air Force sought proposals to "[p]rovide services to support functions for the 690th Cyberspace Operations Group." Id. at 239.[1] According to the Solicitation, that Group "performs 24/7/365 Air Force Information Network operations that include[] defensive cyberspace operations (DCO), network management, information assurance, and fault resolution activities to maintain the operational capabilities of the network, establish the domain for AF cyberspace operations, and ensure AF cyberspace superiority."[2] Id.

---

[1] The RFP involved the "consolidation of requirements previously performed under three separate contracts": 1) an Enterprise Network Services Acquisition contract, performed by Valdez; 2) an Air Force Information Network contract, performed by Telos Corporation (Telos); and 3) an Enterprise Service Desk contract, performed by Information Innovators, Inc. AR Tab 3 at 79–82.

[2] The Air Force Information Network (AFIN) is the "globally interconnected, end-to-end set of Air Force information capabilities, and associated processes for collecting, processing, storing, disseminating, and managing information on-demand to warfighters, policy-makers, and support personnel." AR Tab 7 at 344. It also includes "owned, leased and contracted communications and computing systems and services, software (including applications), data, security services, other associated services, and national security systems." Id. The contractor would thus "provide

The Solicitation required offerors to submit proposals in four separate parts: 1) the technical proposal; 2) present/past performance information; 3) price; and 4) contract documentation. Id. at 216. With respect to present/past performance (the evaluation factor that is the primary focus of this protest), the RFP instructed offerors to "submit Past Performance Information (PPI) . . . on the offeror and all subcontractors, teaming partners, and/or joint venture partners." Id. at 220. The Air Force directed offerors to "include a cross-reference matrix identifying . . . [performance work statement] references and the team member(s) proposed to perform that function." Id. It also advised them that "[p]ast performance of either party in a joint venture counts for the past performance of the entity." Id.

## II.    The Solicitation's Evaluation Factors

### A.    <u>Overview</u>

As set forth in Section M of the Solicitation, entitled "Evaluation of Offers," the RFP was "a competitive best value source selection, evaluating technical, past performance, and price, in which competing offerors' past performance history will be evaluated on a basis approximately equal to cost or price considerations where the Government may elect to trade present/past performance for price if warranted." Id. at 228. In accordance with "FAR 15.101-1(c), the government reserve[d] the right to award a contract to other than the lowest priced offer if the lowest priced offeror is judged to have a performance confidence assessment of 'Satisfactory Confidence' or lower." Id. "In that event," the Air Force continued, "the Source Selection Authority [would] make an integrated assessment best value award decision." Id. (also stating that the Air Force "intend[ed] to award a single contract to the offeror who is deemed responsible . . . , whose proposal conforms to the solicitation's requirements . . . , and who is judged, based on the evaluation factors and sub-factors, to represent the best value to the Government").[3]

Pursuant to the Solicitation, the Air Force would first "[e]valuate all proposals for technical acceptability and risk," and assign a rating of either acceptable or unacceptable. See id. Next, using the criteria described below, it would "[a]ssess performance confidence for each offeror." Id. It would then "[e]valuate all proposals to determine whether the price [was] fair and reasonable . . . , balanced . . . , and affordable," and rank the proposals by "total evaluated price." Id. Finally, the Air Force would make a "Best Value Decision." Id.

---

support services to operate, sustain, and assure the availability of AFIN to enable war-fighter mission execution." Id. at 240.

[3] The Air Force's Source Selection Plan (SSP) also stated that the Air Force would "issue an open market RFP on a competitive basis applying the Department of Defense (DoD) Source Selection Procedures Trade-off source selection process," and that the RFP would be "100% set-aside for woman-owned small businesses (WOSB) utilizing best value procedures." AR Tab 6 at 131.

**B.     Assessing Performance Confidence**

The dispute in this case primarily concerns the validity of the Air Force's performance confidence assessments. As defined in the RFP, "performance confidence" represents the "degree of confidence the Government has in an offeror's ability to perform the required services to meet users' needs based on a demonstrated record of performance." Id. at 230. The agency's assessment of performance confidence would be based on its evaluation of the relevancy, recency, and quality of the examples of past performance submitted by offerors. See id. at 228–31.

The Solicitation included a matrix to determine the relevancy of past performance in each of the five mission areas of the contract. Those mission areas were: 1) Integrated Network Operations and Security Centers (I-NOSC); 2) Enterprise Service Unit (ESU); 3) Operations and Mission Area Support (O&M); 4) AFIN Mission Assurance Center (AMAC); and 5) Area Processing Center (APC). Id. at 368–69. Within each of these areas, a past performance reference would be rated either "relevant," "somewhat relevant," or "not relevant." Id. The criteria for determining whether past performance was "relevant" or "somewhat relevant" varied for each mission area. Id. For all five mission areas, past performance would be found "not relevant" if the experience did "not meet the criteria of relevant or somewhat relevant." Id. The Solicitation further provided that "[i]n determining relevancy for each mission area identified, consideration [would] be given to the effort, or portion of the effort, being proposed by the offeror, teaming partner, or subcontractor whose contract is being reviewed and evaluated." Id.

With respect to recency, the Solicitation provided that "[t]o be recent, the effort must be ongoing or must have been performed during the past three years from the date of issuance of [the] solicitation." Id. at 231. Performance that was ongoing as of the time of the Solicitation would be considered recent "so long as the effort ha[d] been performed for at least six months." Id.

Once the Air Force made its recency and relevancy determinations, it would assess the "performance quality of the [recent and relevant] work performed," and assign one of six possible "performance quality ratings": exceptional, very good, satisfactory, marginal, unsatisfactory, or not applicable. Id. at 231–32. An "adverse" quality assessment was defined as "past performance information that supports a less than satisfactory rating on any evaluation element or any unfavorable comment(s) received." Id. at 232.

Finally, following the assignment of quality ratings, the Air Force would assign offerors an "integrated performance confidence assessment rating," based upon a consideration of the contract's five mission areas in the following order of importance: 1) I-NOSC; 2) ESU, O&M, and AMAC, weighted equally; and 3) APC. Id. Tab 8 at 435. The five possible integrated performance confidence assessment ratings were substantial confidence, satisfactory confidence, limited confidence, no confidence, and unknown confidence. Id. Tab 7 at 232–33.

**III.    Initial Offers**

ITES, Valdez, and several other offerors submitted proposals in response to the Solicitation. Id. Tab 19 at 827; id. Tabs 19–20. In its proposal, ITES explained that it is a joint

4

venture between Information International Associates, Inc. (IIA) and Telos.[4] Id. Tab 19 at 845. As specifically relevant to the issues herein, in its proposal, ITES represented that as the "prime/offeror for this contract," it would "perform[] approximately 65% of the scope and maintain[] overall responsibility for project execution." Id. Tab 19 at 959. Of that 65%, IIA would perform approximately 33%, "in all areas of the Performance Work Statement," and Telos would perform 32%, also in all mission areas. Id. at 967–68. Three subcontractors would perform the remaining 35% of the contract's work.[5] Id.

ITES submitted eight past performance references: three for Telos, one for IIA, two for subcontractor Information Innovators, one for subcontractor Northrop Grumman, and one for subcontractor Epsilon. See id. at 960–63. As described in greater detail below, the Air Force's treatment of the past performance references involving IIA and Northrop Grumman are both at issue in this protest. The past performance reference ITES submitted for IIA was a contract IIA held with the United States Department of Energy (DOE) for a period of performance beginning July 1, 2010, and ending June 21, 2015, with a value of $17,579,000. Id. at 1014. The past performance reference ITES submitted for Northrop Grumman was a contract Northrop Grumman currently holds with "NETCOM/5th Signal Command," on which it started performance September 20, 2014, and on which performance is not expected to end until July 19, 2019. Id. at 980.

## IV.    The Competitive Range Determination

On August 7, 2015, the Source Selection Evaluation Board (SSEB) chairperson and the contracting officer conducted an internal competitive range briefing, the purposes of which were to "provide initial evaluation results," "request approval of [a] competitive range," and "request approval to release evaluation notices and enter into discussions." Id. Tab 21 at 1586, 1588. The slides prepared in connection with the briefing included a summary of the SSEB's initial evaluations of the technical, past performance, and price factors contained in each offeror's proposal. Id. at 1594.

The presentation slides reveal that the SSEB's initial evaluation of both ITES's proposal and Valdez's proposal resulted in three acceptable technical evaluation ratings and two unacceptable ratings. Id. The SSEB assigned a rating of substantial confidence to both offerors' past performance. Id. ITES's total evaluated price was calculated to be $185,890,703.72 and Valdez's price was calculated to be $162,997,211.78. Id.

---

[4] IIA, the managing member, owns 51% percent of ITES, while Telos owns 49%. AR Tab 19 at 959.

[5] Those subcontractors were: 1) Information Innovators, Inc. (performing 20% of the work on the contract, in the O&M and AMAC mission areas); 2) Northrop Grumman (performing 10% of the contract work, in the I-NOSC, ESU, and APC mission areas); and 3) Epsilon System Solutions (Epsilon) (performing 5% of the work on the contract, in the I-NOSC and APC mission areas). See AR Tab 19 at 967–68.

The SSEB recommended a competitive range of six offerors, including both ITES and Valdez. See id. at 1864. On August 18, 2015, the contracting officer informed these offerors of their inclusion in the competitive range. Id. Tab 22 at 1901.

## V.   Evaluation Notices and Proposal Revisions

After the Air Force issued a series of evaluation notices and the offerors submitted responses, the SSEB conducted another internal briefing on April 25, 2016, based on the revised proposals it had received. See id. Tab 50 at 5896. This time, it rated both ITES and Valdez "acceptable" on all technical evaluation factors. Id. at 5906. Both also maintained substantial confidence performance assessments. Id. ITES's total evaluated price had increased to $199,594,712, while Valdez's had increased to $202,927,535.18. Id.

On April 29, 2016, the Air Force issued a request for final proposal revisions. Id. Tab 51 at 6195. One week later, on May 6, 2016, both ITES and Valdez submitted final proposal revisions. See id. Tabs 55–56. On May 25, 2016, the government notified offerors that it was reopening discussions and issued a sixth round of evaluation notices. See id. Tab 57 at 7679.

Following its receipt of responses to the sixth round of notices, the Air Force conducted a third internal briefing on July 13, 2016. Id. Tab 62 at 8230. The SSEB continued to view both ITES's and Valdez's proposals as technically acceptable and continued to assign substantial confidence ratings to both offerors based on their past performance. Id. at 8241. The slides accompanying this third briefing reflect that ITES's price had increased to $202,020,240.49, while Valdez's had increased to $203,254,988.60. See id.

## VI.   Final Proposals and Evaluations

On July 14, 2016, the Air Force again issued requests for final proposal revisions. Id. Tab 63 at 8590. ITES submitted its final proposal on July 19, 2016 "without change to technical, pricing, or contractual data." Id. Tab 64 at 8599. It also resubmitted its original present/past performance information. See id. at 8788–8931.

On August 26, 2016, the SSEB conducted a final internal briefing. Id. Tab 66 at 9321. The slides accompanying the briefing reflect that the SSEB maintained the same technical ratings, past performance assessments, and total evaluated prices for ITES and Valdez that it had assigned during its prior internal briefing on July 13. See id. at 9334. The presentation also included detailed tables and charts that reflected a comparative assessment of all of the proposals in the competitive range, along with the SSEB's recommendation that the contract be awarded to Valdez. Id. at 9427–89.

## VII.   Source Selection Decision Documents and Award

### A.   Comparative Analysis Report and Award Recommendation

Prior to issuing a formal source selection decision, the Source Selection Advisory Council (SSAC) prepared a "Comparative Analysis Report and Award Recommendation." Id. Tab 67 at 9580. As pertinent to the issues presented in this case, the report contained (1) a comparative analysis of the past performance of all offerors in the competitive range using the

same charts and analyses presented during the SSEB's final briefing, id. at 9589–9609; (2) an evaluation summary, id. at 9615–17; and (3) a best value evaluation based on the source selection data, id. at 9617–19. The Air Force described this comparative analysis as a "best value integrated assessment." Id. at 9605.

The integrated assessment primarily compared the relative merits of four proposals. The first of these was the proposal submitted by Offeror X, which was the lowest-priced proposal. See id. at 9605, 9617. Offeror X's proposal, however, had received a performance confidence rating of satisfactory confidence. Id. at 9605. The other three proposals assessed were submitted by ITES, Valdez, and Offeror Y. Id. Each of these proposals had received a performance confidence rating of substantial confidence. Id. Offeror Y's proposal was the highest-priced of these three. Id.

With respect to past performance, the SSAC observed that the SSEB had "evaluated [the four offerors'] PPI references individually for each mission area." Id. Further, "[t]he team also gave consideration to the effort, or portion of the effort, being proposed by the offeror, teaming partner, or subcontractor whose contract was being reviewed and evaluated." Id. Finally, the team also "used the Labor Matrix submissions to help establish the specific degrees to which each partner was proposed to contribute to the work effort in each mission area." Id.

In comparing the four proposals on this aspect, the SSAC noted that the "difference in the quality of each offeror's past performance was so minimal that it was not a discriminator." Id. at 9606. Instead, the "primary difference between the offerors' proposals related to the degree to which each teaming partner brought relevant past performance experience that aligned with the mission areas their staff was proposed to work." Id. After setting forth a detailed past performance comparison for each mission area, the Air Force concluded the past performance comparison by noting that "Valdez consistently demonstrated the [second] most relevancy from the prime and team partners where they were proposed to perform." Id. at 9608. In contrast, "ITES demonstrated past performance in the ESU and AMAC mission areas, but did not have as much relevancy in other mission areas, including the INOSC." Id. at 9608–09.

Turning to the evaluation summary, the SSAC again noted that "[i]n accordance with Section L [of the RFP], the . . . source selection evaluation team recognized the separate contributions of demonstrated past performance on the part of each party in a JV," and therefore, "past performance confidence of either party in a joint venture counted for the past performance of the JV entity." Id. at 9616. Further, in accordance with RFP Section M, the Air Force stated that it had given consideration to the effort proposed by the offeror, teaming partner, or subcontractor whose contract was reviewed so that "past performance was only assessed and recognized when it applied to mission areas where a team member was proposed to work." Id. The SSAC, "[i]n considering Valdez's proposal in comparison to ITES's proposal," noted that "Valdez demonstrated past performance for each of its individual members in the areas where they are proposed to work." Id. at 9618. For ITES, on the other hand, the "Substantial Confidence past performance assessment was largely based on Telos' past performance information, but Telos is proposed to accomplish only 32% of the effort." Id. Moreover, "ITES subcontractors with no demonstrated Relevant past experience are proposed to accomplish large portions of the work." Id. Based upon this analysis, the report concluded that "[w]hile the price differential of 0.6% ($1,234,748.11) is in favor of ITES," the "price premium [of Valdez] is

acceptable in order to award to an offeror with the demonstrated experience of Valdez." Id. at 9619. The SSAC also found that Valdez's proposal represented a better value than Offeror X's proposal. Id. at 9618.

Further, the SSAC found that it would "not [be] worth the trade" to pay the price premium for ITES's proposal over Offeror X's proposal because that "would achieve a Substantial Confidence in performance where the underlying reason for th[e] assessment is a minority member of the JV which is only providing 32% of the effort." Id. at 9617. The SSAC therefore recommended that the award be made to Valdez. Id. at 9620.

## B.    Award Decision

On September 21, 2016, the source selection authority, Major General Christopher P. Weggeman, issued the source selection decision. Id. Tab 70 at 10236. He determined that "the proposal submitted by Valdez offer[ed] the best overall value to satisfy the Air Force's stated IAFNOS requirements." Id. Maj. Gen. Weggeman then summarized and reiterated the discussion and comparison of the offers as set out in the earlier briefings and the comparison report. See id. at 10237–52.

In particular, with respect to ITES's proposal, Maj. Gen. Weggeman found it significant that "only Telos' information was relevant throughout all five areas of the relevancy matrix table," whereas "[IIA]'s information was only somewhat relevant in one area (O&M) and Information Innovators was somewhat relevant in a single area (AMAC)." Id. at 10249. "Accordingly," he wrote, "ITES' confidence assessment rests largely with a single JV partner . . . who was not providing the majority of the manpower." Id. On the other hand, Maj. Gen. Weggeman noted that Valdez "demonstrated past performance for three of the four individual members in the areas where they are proposed to work," and that "Valdez itself demonstrated relevant experience in all mission areas."[6] Id. at 10250. He thus "direct[ed] contract award to Valdez," in part because the "price premium difference between" Valdez and ITES "is worth the trade to obtain the breadth of experience offered by Valdez." Id. at 10252.

On October 13, 2016, the Air Force awarded the contract to Valdez. Id. Tab 73 at 10338.

## VIII.   GAO Protest

On October 24, 2016, ITES filed a bid protest with the Government Accountability Office (GAO). Id. Tab 79 at 10525. As a result, the Air Force suspended work on the contract. Id. Tab 80 at 10634. ITES asserted the same procurement errors before GAO that it asserts here and which are discussed below. GAO denied ITES's protest on January 31, 2017. Id. Tab 88 at 14819.

---

[6] Like the SSAC, Maj. Gen. Weggeman also stated that it was "not worth" the "price premium to award to ITES over [Offeror X]" because ITES's substantial confidence rating was "based on the performance of a minority member of a JV that is only performing a third of the efforts." Id. at 10249.

## IX.     This Action

On February 2, 2017, the Air Force issued contract modification P00002, allowing Valdez to begin work. Id. Tab 89 at 14828. ITES filed suit in this court eight days later, on February 10, 2017. Compl., ECF No. 1. In its complaint, ITES alleges that the Air Force's "decision to not . . . award the contract to ITES was arbitrary, capricious, an abuse of discretion, and contrary to law." Id. at 9. Specifically, ITES claims that the Air Force erred when it allegedly failed "to credit ITES with the past performance of its members"; "made unreasonable determinations with respect to the recency and relevance of ITES' past performance"; and "conducted an unreasonable best value tradeoff analysis." Id. ¶¶ 34–36.

Along with its complaint, ITES filed a motion for a temporary restraining order and preliminary injunction. ECF No. 5. On February 14, 2017, after oral argument, the Court denied ITES's motion, based in part upon a failure to establish irreparable harm. See Order, ECF No. 23.

On February 28, 2017, ITES moved for judgment on the administrative record and injunctive relief in the form of an order cancelling the contract award to Valdez and requiring a reevaluation of proposals in accordance with the Solicitation. See Mem. in Supp. of ITES's Mot. for J. on the Admin. R. (Pl.'s Mem.) at 33, ECF No. 30. On March 14, 2017, the government moved to dismiss the complaint and also filed a cross-motion for judgment on the administrative record, as did Valdez. ECF Nos. 32–33. Oral argument was held on April 13, 2017. See Order, ECF No. 23.

## DISCUSSION

## I.     Subject Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding

that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359–62 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). In making the standing determination, the Court assumes well-pled allegations of error in the complaint to be true. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131–32, 1131 n.9 (Fed. Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–95 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

Taking ITES's allegations as true, as the Court must for purposes of this analysis, the Court concludes that ITES has demonstrated standing to bring this bid protest. Thus, ITES alleges that the Air Force committed a number of errors during evaluation of its past performance, and that those errors individually and/or collectively played a role in the unfavorable contrasts that the agency ultimately drew between ITES's past performance and that of Valdez. See AR Tab 70 at 10249. In particular, it asserts that the Air Force failed to give ITES sufficient credit for the past performance of Telos, a member of the joint venture. Pl.'s Mem. at 15–17. It further contends that the agency "misevaluated" the relevancy of the past performance of IIA, the other member of the joint venture, on its contract with DOE. Id. at 18–21. Finally, it claims that it was unreasonable for the Air Force to find that the past performance of one of its subcontractors, Northrop Grumman, was not recent. Id. at 21–22. If not for these errors, according to ITES, its "past performance record" would have been found "as strong as, if not superior to, Valdez's record." Id. at 18.

The Court agrees that if it were to find meritorious ITES's claims regarding the Air Force's evaluation of its past performance, then ITES (whose offer was priced approximately 0.6% lower than Valdez's) would have a substantial chance of securing the award over Valdez. It would also have a substantial chance of securing the award over Offeror X, whose confidence rating was merely "satisfactory confidence."

The government and Valdez's arguments to the contrary lack merit. Specifically, they argue that ITES does not have standing to pursue this bid protest because the Air Force determined that both Offeror X's proposal and Valdez's proposal were better values than ITES's proposal. See Def.'s Mot. to Dismiss Or, in the Alternative, for J. on the Admin. R. & Opp'n to Pl.'s Mot. for J. on the Admin. R. (Def.'s Mot.) at 14, ECF No. 32; Def.-Intervenor's Resp. to Pl.'s Mot. for J. on the Admin. R. & Cross-Mot. for J. on the Admin. R. (Def.-Intervenor's Resp.) at 15–16, ECF No. 33. Thus, according to Valdez, "[e]ven if ITES were successful in its protest grounds, it would not have been selected over [Offeror X] . . . because the SSA's determination was based on the fact that ITES's 'Substantial Confidence' rating (which cannot

get higher), was primarily based on the performance of a minority member." Def.-Intervenor's Resp. at 17.

Even assuming that Valdez has accurately characterized the Air Force's reasoning, however, the determination it points to is the very determination ITES claims was legally erroneous. As noted, the Court must assume the truth of the alleged errors in the procurement for purposes of determining standing. See Linc Gov't Servs., 96 Fed. Cl. at 694–95. And were the alleged errors corrected, the Air Force might have determined that ITES's proposal, like Valdez's proposal, offered a better value than Offeror X's proposal. Accordingly, the Court concludes that absent the alleged errors, ITES would have had a substantial chance of securing the award over Offeror X.[7]

In short, ITES has standing to prosecute this bid protest. The government's and Valdez's motions to dismiss for lack of subject matter jurisdiction are therefore **DENIED**.

## II.    Standards of Review

### A.    Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC). Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

### B.    Bid Protest Cases

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's

---

[7] In the alternative, ITES also argues that no best value tradeoff should have been conducted between itself and Valdez because the Air Force was required to award it the contract as the lowest-priced offeror to receive a substantial confidence rating. Pl.'s Mem. at 22–25. If the Court were to conclude that this claim had merit, that would also provide a basis for determining that ITES would have a substantial chance of receiving the award upon re-evaluation.

decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1338.

## III.   Challenges to the Past Performance Evaluation

### A.   Alleged Failure to "Count" the Past Performance of Telos in Evaluating Past Performance

ITES's first ground for protest is based on the Solicitation's instruction to offerors submitting past performance information that the "[p]ast performance of either party in a joint venture counts for the past performance of the entity." AR Tab 7 at 220. It contends that the Air Force violated this provision when it unfavorably compared the breadth of ITES's past performance to that of Valdez based on the fact that Telos—which had experience in all five mission areas—was neither the managing member of the joint venture nor was proposed to provide the majority of the manpower. See Pl.'s Mem. at 16. This argument is without merit.

It bears noting at the outset that the provision upon which ITES relies is contained in the RFP's proposal preparation instructions, not in the proposal evaluation section. See AR Tab 7 at 220. The apparent purpose of the instruction was to advise joint ventures that they might satisfy the Solicitation's requirements through examples of past performance by individual joint venture partners, which the agency would take into consideration in evaluating the joint venture's proposal. This interpretation comports with the plain meaning of the word "counts," which is "to include in the reckoning," or to "impute to, put down to the account of." Count, Oxford English

Dictionary, http://www.oed.com/view/Entry/42619?rskey=28yEQY&result=4#eid (last visited Apr. 27, 2017).[8]

In this case, the record is clear that the agency "counted" or considered the past performance of Telos in evaluating its confidence in the ability of the joint venture to perform on the contract. In fact, the Source Selection Decision contains an explicit statement that "the confidence assessment of 'Substantial' was largely based on Telos['s] past performance information." AR Tab 70 at 10249. The Air Force observed that while IIA, the managing and majority member of the ITES joint venture, had somewhat relevant experience in just one mission area, Telos, the minority member of ITES, had relevant experience in all five mission areas. Id. at 10242; see also id. Tab 62 at 8382; id. Tab 67 at 9599. It concluded that—notwithstanding IIA's lack of relevant experience in four of five mission areas—ITES would be credited with relevant experience in all five mission areas. Id. Tab 50 at 6082; see also id. Tab 62 at 8383; id. Tab 66 at 9394 (final briefing slide stating that ITES itself "proposed to perform 65% of the overall effort, demonstrated Relevant experience for all the mission areas[,] and received Very Good to Exceptional quality ratings on these efforts"). Thus, the agency "counted" the past performance of Telos as the past performance of ITES.

ITES's further argument—that the "counting" requirement also effectively prohibited the Air Force from considering in any way the relative contributions that each joint venture member would be making to the performance of each of the contract's five mission areas—cannot be reconciled with the Solicitation when read as a whole. See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 & n.4 (Fed. Cir. 2004) (principles of contract interpretation apply equally to the interpretation of solicitations); Linc Gov't Servs., LLC, 96 Fed. Cl. at 708 (citation omitted) (cardinal principle of contract interpretation is that a court must interpret a solicitation as a whole, giving reasonable meaning to all its parts). Thus, the Solicitation required offerors to identify the specific functions that each team member would perform under the contract. AR Tab 7 at 220. It further provided that past performance references would "be evaluated individually for relevancy in each mission area," and that "consideration [would] be given to the effort, or portion of the effort, being proposed by the offeror, teaming partner, or subcontractor whose contract is being reviewed and evaluated." Id. at 220, 231.

The Air Force acted consistently with these evaluation criteria when it took into consideration the role that Telos was proposed to play in the performance of the contract. Further, ITES's argument that the Air Force was precluded from doing so would lead to absurd results. It would mean, for example, that the Air Force would have been prohibited from differentiating among the past performances of members of a joint venture even where a member would perform only a tiny percentage of the actual contract work.

Accordingly, because the Air Force considered or "counted" the past performance of ITES's members in evaluating the past performance of ITES, and because the Air Force's past

---

[8] A court looks to dictionary definitions to determine a word's ordinary and established meaning in interpreting a solicitation. See Info. Tech. & Applications Corp., 316 F.3d at 1320; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243–44 (Fed. Cir. 2010).

performance comparison complied with the provisions of the RFP, ITES's protest on this ground must be denied.

**B.**     **The Relevancy of IIA's Past Performance Reference for the ESU and AMAC Mission Areas**

As its second ground for protest, ITES alleges that the Air Force applied a criterion that was not in the Solicitation when it evaluated the relevancy of venture member IIA's performance on its contract with DOE. Pl.'s Mem. at 18. This argument is unpersuasive.

The Solicitation sets forth the criteria for determining the relevance of an offeror's past performance in the ESU and AMAC mission areas. First, for the ESU mission area, past performance would be found "relevant" if the offeror showed experience (1) "[p]erform[ing] administration duties for directory and authentication services" and at least two of three other specified functions "in a contract with at least an annual amount of $6 million"; and (2) "addressing 3 or more geographically dispersed MAN [Metropolitan Area Network] environments."[9] AR Tab 7 at 368. Past performance would be found "somewhat relevant" if the offeror showed experience (1) performing any two of the four specified functions "in a contract with at least an annual amount of $2 million" and (2) "addressing at least one MAN environment." Id.[10]

Similarly, for the AMAC mission area, past performance would be found "relevant" if the offeror demonstrated experience (1) in each of three specified functions "in a contract with at least an annual amount of $2 million" and (2) "addressing 3 or more geographically dispersed MAN environments." Id. at 369.[11] Past performance would be found "somewhat relevant" if the offeror showed experience (1) in at least one of the three specified functions "in a contract with at least an annual amount of $1 million" and (2) addressing at least one MAN environment." Id.

The Air Force initially found IIA's performance on the DOE contract "somewhat relevant" to both the ESU and AMAC mission areas, but included a caveat, observing that "[t]he number of supported geographically dispersed MANs could not be ascertained" from the

---

[9] "A Metropolitan Area Network (MAN) is a large computer network that spans a metropolitan area or campus. Its geographic scope falls between a WAN and LAN. MANs provide Internet connectivity for LANs in a metropolitan region, and connect them to wider area networks like the Internet." AR Tab 7 at 370.

[10] The functions specified for the ESU mission area were: 1) "[p]erform administration duties for directory and authentication services"; 2) "[p]erform administration duties for messaging/collaboration services"; 3) "[p]erform administration duties for storage and virtualization services"; and 4) "[p]erform network and application monitoring management." AR Tab 7 at 368.

[11] The functions specified for the AMAC mission area were: 1) "[o]rchestrate outage and service restorations"; 2) "[c]onduct Compliance Management programs"; and 3) "[c]onduct Vulnerability Management programs." AR Tab 7 at 369.

material ITES submitted. Id. Tab 68 at 9968–70. It later revisited and reversed this initial finding, explaining in its "Proposal Analysis Report" that the SSEB concluded "[u]pon further evaluation . . . . [that] the offeror did not perform implementation or maintenance of the MAN" for this past performance reference, and therefore the Air Force "determined [it] Not Relevant" to the ESU and AMAC mission areas. Id. at 9988.

The Air Force's revised finding was apparently based on an email exchange between DOE and the Air Force in July of 2015. See id. Tab 21.1 at 1584–85; see also id. Tab 63 at 8590 (letter to ITES noting the change in relevancy assessment because "[a]dditional information was received"). A member of the SSEB's past performance team apparently made inquiry with DOE regarding the number of MANs that were supported on IIA's contract with DOE. See id. Tab 21.1 at 1585. In response, DOE informed the Air Force that "one [MAN] was supported for [the] contract." Id. at 1584. DOE also volunteered, however, that "while support . . . was provided . . . the entirety of functions associated with implementation and maintenance of the MAN was not." Id.

In its protest, ITES does not take issue with the Air Force's conclusion that IIA did not perform the entirety of functions involved in the implementation or maintenance of the MAN as part of the DOE contract. See Pl.'s Mem. at 19–21. In fact, it does not argue that it performed any of the functions. Rather, it contends that there was no requirement in the Solicitation that it perform functions associated with maintaining and implementing the MAN, and that the Air Force thus added a new unstated and unreasonable evaluation criterion when it applied such a requirement. Id. at 19. The Court, like GAO before it, finds this argument unpersuasive.[12]

The relevant language in the RFP required offerors to demonstrate experience "addressing" a MAN environment. See AR Tab 7 at 368–69. To "address" means "to direct the efforts or attention of," or "to deal with." Address, Merriam-Webster, https://www.merriam-webster.com/dictionary/addressing (last visited Apr. 27, 2017). As noted, the Air Force concluded that IIA lacked experience "addressing" a MAN environment because it "did not perform implementation or maintenance of the MAN." AR Tab 68 at 9988. The Air Force's interpretation of the RFP's criteria was a reasonable one. To "implement" means "to carry into effect," The New Fowler's Modern English Usage 382 (R.W. Burchfield ed., 3d ed. 1996), while "maintenance" means "the upkeep of property or equipment," Maintenance, Merriam-Webster, https://www.merriam-webster.com/dictionary/maintenance (last visited Apr. 27, 2017). While the language of the Solicitation is not a model of clarity, it was reasonable for the Air Force to interpret the requirement that an offeror have "address[ed]" a MAN environment as a requirement that it have performed functions involved in the implementation and maintenance of that environment.

---

[12] Although GAO opinions are not binding on the Court of Federal Claims, the Court "may draw on GAO's opinions for its application of [its] expertise." See Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011); see also Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 503 (2005) (noting that GAO decisions are not binding on the court but "are persuasive").

Finally, there is no merit to ITES's argument (first raised in a footnote) that the RFP language contained a latent ambiguity as to what was meant by "addressing" a MAN environment, such that the provision should be construed against the Air Force. Pl.'s Mem. at 19 n.8; Pl.'s Reply Mem. in Supp. of IT Enter. Sols. JV, LLC's Mot. for J. on the Admin. R. at 8–10, ECF No. 40. Solicitation language is ambiguous "if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." AM Gen., LLC v. United States, 115 Fed. Cl. 653, 670 (2014) (quoting Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993)). For the reasons set forth above, the Court has found the Air Force's interpretation of the relevant language reasonable. On the other hand, ITES has failed to identify any alternative interpretation of the language in the RFP, reasonable or otherwise. Specifically, ITES has not provided its own explanation of the meaning of the language in the relevancy matrix requiring that the offeror show experience "addressing" at least one MAN environment. It simply ignores that language. Accordingly, ITES has failed to demonstrate that the matrix is susceptible to two reasonable readings and thus latently ambiguous.

Finally, and in any event, the Court concludes that even if the Air Force committed errors in its evaluation of IIA's past performance in the ESU and AMAC mission areas, ITES was not significantly prejudiced by those errors. See Bannum, Inc., 404 F.3d at 1357–58 (in order to prevail in a bid protest a plaintiff must show that it suffered significant prejudice as a result of the agency's errors). Specifically, the Court finds that even if the Air Force had credited ITES for IIA's past performance on the DOE contract in those mission areas, it would not have made any material difference to the Air Force's evaluation of the relative merits of the proposals of ITES and Valdez.

First, the specific mission areas in which the Air Force found ITES's proposal to be weaker than Valdez's proposal because of a lack of depth in staffing were I-NOSC, O&M, and APC, not ESU and AMAC. See AR Tab 67 at 9606–08; see also id. at 9600; id. at 9608–09. Further, ITES already had highly-rated past performance covering all of the staffing for ESU, even without considering IIA's contract.[13] And finally, as to the AMAC mission area, it would have made little difference if the Air Force credited IIA with somewhat relevant past performance (as ITES argues it should have) because ITES was proposed to perform only 18% of the work in that mission area, while its subcontractor, Information Innovators, would perform 82%. AR Tab 70 at 10242.

In short, ITES has failed to demonstrate a substantial chance that it would have received the award absent the Air Force's alleged errors in evaluating the relevance of IIA's past

---

[13] The Air Force wrote in the Source Selection Decision that the ITES joint venture, which would perform 100% of the contract's work in the ESU area, had "extensive past performance in the ESU mission area with 97-100% of the proposed staffing from team members with Relevant past performance with Very Good and Exceptional quality." AR Tab 70 at 10246. It also referenced its earlier comparative analysis, id., in which it stated that ITES had "four Relevant PPIs that applied to staffing in support of 100% of the ESU mission," id. Tab 67 at 9606.

performance in the ESU and AMAC mission areas. It has, accordingly, failed to show the significant prejudice necessary to prevail in this bid protest based on those alleged errors.

### C.   The Air Force's Recency Determination

ITES's final challenge to the Air Force's past performance evaluation attacks the Air Force's determination that the past performance reference supplied for subcontractor Northrop Grumman was not recent. Pl.'s Mem. at 21. This contention also lacks merit.

The RFP stated that "[a]n assessment of the past performance information will be made to determine if it is recent." AR Tab 7 at 231. "To be recent," according to the RFP, "the effort must be ongoing or must have been performed during the past three years from the date of issuance of this solicitation." Id. "On-going actions will be considered as recent so long as the effort has been performed for at least six months." Id.

The Northrop Grumman contract ITES submitted was not "recent" within the meaning of the Solicitation. Although the Northrop Grumman contract was apparently executed in August 2014, which was more than six months before the Solicitation was issued on March 13, 2015, performance on that contract did not begin until September 20, 2014, one week short of the six months required in order for a contract to be deemed "on-going" and thus recent. See id. Tab 19 at 980–81; see also id. Tab 67 at 9599.

ITES alternatively argues that the Air Force should have found Northrop Grumman's performance recent because the work Northrop Grumman performed on that contract beginning September 20, 2014, was a continuation of work it performed on contracts within the past three years. See Pl.'s Mem. at 22. This contention is equally unavailing. The RFP required offerors to submit to the Air Force the contracts they intended to rely upon for past performance references. Id. Tab 7 at 220. The only contract ITES submitted for Northrop Grumman was the contract described above, on which performance began September 20, 2014. See id. Tab 19 at 980; see also id. Tab 67 at 9599. ITES's argument that performance on the 2014 contract should have been found recent based on the relationship between the 2014 contract and other agreements it did not submit must therefore be rejected.

## IV.   ITES's Challenge to the Air Force's Best Value Determination

In its final challenge to the Air Force's decision, ITES alleges that the Air Force's best value determination was arbitrary and capricious. It contends that the Solicitation required the Air Force "to make its award to the lowest-priced offeror with a Substantial Confidence rating." Pl.'s Mem. at 24. According to ITES, because it had a Substantial Confidence rating, and because its price was lower than Valdez's price (albeit by only a very slight amount), the Air Force had no choice but to award it the contract. These contentions are without merit.

First, the Solicitation is clear that the Air Force would make an award decision based upon a best value determination. In Section M of the RFP, the Air Force described the Solicitation as "a competitive best value source selection." AR Tab 7 at 228. The Air Force also stated that it "intend[ed] to award a single contract to the offeror who . . . represent[s] the best value to the government." Id. It further warned offerors that "the Government may elect to trade present/past performance for price if warranted." Id.

The Court finds unavailing ITES's reliance upon language in the Solicitation stating that "[in accordance with] FAR 15.101-1(c), the government reserves the right to award a contract to other than the lowest priced offer if the lowest priced offeror is judged to have a performance confidence assessment of 'Satisfactory Confidence' or lower." Id.; see also Pl.'s Mem. at 23–24. ITES did not submit the lowest-priced offer; Offeror X did. Moreover, the RFP explicitly stated that in the event the lowest-priced offeror had a "satisfactory" or lower performance confidence assessment (which Offeror X did), "the Source Selection Authority [would] make an integrated assessment best value award decision" (which the Air Force did). AR Tab 7 at 228. There is nothing in the Solicitation which suggests the Air Force would award the contract to the next lowest-priced offeror if that offeror had a performance confidence rating higher than "satisfactory."

Curiously, ITES also relies upon language in the SSP which states that "once technically acceptable, this competitive best value source selection allows the Government to trade to a higher priced proposal when superior past performance confidence is demonstrated." Id. Tab 6 at 133; see also Pl.'s Mem. at 26. As best the Court can understand, ITES's argument is that in this case, a tradeoff was not permitted because the Air Force assigned both ITES and Valdez the same "substantial" confidence rating, so that neither could be said to have demonstrated "superior" past performance confidence. But contrary to ITES's premise, the fact that ITES and Valdez both received the same adjectival rating for past performance confidence (i.e., "substantial confidence") does not mean that the Air Force did not find one proposal "superior" to the other in terms of past performance confidence. Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 719 (2011) (stating that "it is incumbent upon the procuring agency . . . to look beyond adjectival ratings" and that "proposals with the same adjectival rating are not necessarily of equal quality" (internal quotation and alteration omitted)), aff'd, 691 F.3d 1374 (Fed. Cir. 2012). To the contrary, for the reasons set forth above, largely related to the breadth of Valdez's experience in all five mission areas, the Air Force clearly concluded that Valdez had demonstrated a superior level of past performance confidence, even if it was assigned the same adjectival rating as ITES.

Finally, ITES argues that even if the Air Force permissibly engaged in a best value tradeoff, that tradeoff was arbitrary and capricious because it relied upon a flawed past performance evaluation. Pl.'s Mem. at 27–28. This argument is derivative of ITES's claims challenging the Air Force's evaluation and comparison of the offerors' past performance, which the Court has already rejected. Accordingly, its best value analysis relying upon that evaluation was reasonable and consistent with the Solicitation. For all these reasons, ITES's protest must be denied.

## CONCLUSION

For the reasons set forth above, the government's and Valdez's motions to dismiss are **DENIED**. Additionally, ITES's motion for judgment on the administrative record is **DENIED** and the government's and intervenor's cross-motions for judgment on the administrative record are **GRANTED**. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge